UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

FIREMAN'S FUND INSURANCE
COMPANY, et al.,

          Plaintiff,

   v.

ED NIEMI OIL COMPANY,
INCORPORATED,

          Defendant.

No. CV 03-25-MO

OPINION AND ORDER

MOSMAN, J.,

     At issue in this case is a dispute between insurers about their respective duties to defend the insured, named Plaintiff Ed Niemi Oil Co. ("Niemi"), against any environmental actions brought against it by the Oregon Department of Environmental Quality ("DEQ"). Under Oregon statute, a property owner facing environmental liability can chose one insurer out of its group of potential insurers to assist in environmental proceedings. Or. Rev. Stat. § 465.480(3). Then, it is the responsibility of the chosen insurer to seek contribution from the others, if there are any. *Id.* § 465.480(4). Here, Niemi's potential insurers included Fireman's Fund Insurance Company ("Fireman's Fund"), Oregon Auto Insurance Company and North Pacific Insurance Company ("Oregon Auto/North Pacific" or collectively "defendant insurers"), and Federated Mutual Insurance Company ("Federated Mutual"). Niemi chose Fireman's Fund to assist with the pending DEQ proceedings. In this action, Fireman's Fund seeks a declaratory judgment against the other insurers as to their respective obligations to participate in defending and indemnifying Niemi, and it has moved for partial summary judgment concerning the duty to defend. Oregon

Auto/North Pacific also moved for summary judgment making numerous arguments that the policies they issued do not provide coverage for Niemi in this case. Following oral argument on these motions on June 28, 2005, the defendant insurers contended there was a live issue concerning whether the evidence demonstrating the defendant insurers' potential for indemnification liability was sufficient to trigger any duty to defend. I required Fireman's Fund to make some showing that the defendant insurers will be liable to indemnify Niemi. (6/28/2005 Hr. Tr. at 11). Upon further consideration, I conclude that to demand this showing from Fireman's Fund was in error.

## Discussion

It is well settled that an insurer's duty to defend is separate from and broader than its duty to indemnify. *GE Prop. & Cas. Ins. Co. v. Portland Cmty. Coll.*, __ F. Supp. 2d __, 2005 WL 2044315, at *3 (D. Or. Aug. 24, 2005) (citations omitted). The duty to indemnify exists where the facts proven at trial establish the insured's liability is covered by the policy. *Ledford v. Gutoski*, 877 P.2d 80, 84 (Or. 1994). On the other hand, the duty to defend is based on a possibility of coverage. Specifically, this involves the possibility that the insurer might be liable to indemnify the insured based on the factual allegations asserted in the complaint against the insured. As such, whether a duty to defend exists depends solely on two documents: the complaint and the insurance policy. *Id.* at 82 ("In evaluating whether an insurer has a duty to defend, the court looks *only* at the facts alleged in the complaint to determine whether they provide a basis for recovery that could be covered by the policy . . . .") (emphasis added). And as the *Ledford* court explained, the "insurer has a duty to defend if the complaint provides *any basis* for which the insurer provides coverage." *Id.* at 83 (citation omitted) (emphasis in

original). This standard has been rephrased this way: a duty to defend exists whenever the factual allegations in the complaint would permit the presentation of evidence at trial of an activity covered by the policy. *Schnitzer Inv. Corp. v. Certain Underwriters at Lloyd's of London*, 104 P.3d 1162, 1169 (Or. Ct. App. 2005); *GE Prop. & Cas. Ins. Co.*, 2005 WL 2044315, at *6. Based on this formulation, it is clear that precise allegations of events and the timing of those events are not necessarily required. *GE Prop. & Cas. Ins. Co.*, 2005 WL 2044315 at *9.

Some jurisdictions allow courts to consider evidence extrinsic to the complaint in deciding whether a duty to defend exists. *See e.g., Horace Mann Ins. Co. v. Barbara B.*, 846 P.2d 792, 795 (Cal. 1993) ("Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy."); *Aetna Cas. & Sur. Co. v. Cochran*, 651 A.2d 859, 864-66 (Md. 1995) (same) (listing cases). Oregon is not one of them. *See Home Indem. Co. v. Stimson Lumber Co.*, 229 F. Supp. 2d 1075, 1086 n.3 (D. Or. 2001) (recognizing that "Oregon law differs from California law in allowing extrinsic evidence in assessing the duty to defend" because California allows it and Oregon does not). Oregon does, however, recognize one exception to the policy-&-complaint rule[1] where there is "compelling evidence" that coverage does not exist. *Or. Ins. Guar. Assoc. v. Thompson*, 760 P.2d 890, 893 (Or. Ct. App. 1988). And while this exception might seem to throw open the door to a wide array of potential evidence, the only "compelling evidence" recognized as of yet is a ruling in a separate judicial proceeding that uncontrovertibly establishes that coverage does not

---

[1]Sometimes referred to as the "eight-corners rule." *See e.g., Fed. Ins. Co. v. Ace Prop. & Cas. Co.*, __F.3d__; 2005 WL 2687196, at *2 (5th Cir. Oct. 21, 2005).

exist. *See id.* (holding that where policy precluded coverage for liability resulting from intentional conduct, prior ruling that insured's conduct was intentional defeated duty to defend); *see also N. Pac. Ins. Co. v. Wilson's Distrib. Serv., Inc.*, 908 P.2d 827, 832 (Or. Ct. App. 1995) (holding parties cannot seek to establish facts outside the complaint in declaratory judgment proceedings that "have not been uncontrovertibly established in a separate proceeding"); *Vall. Indust., A Div. of Fisher Grp. v. The Scott Fetzer Co.*, 832 P.2d 1262, 1265 (Or. Ct. App. 1992) ("Even if information learned from outside the complaint may sometimes give notice of a duty to defend, the evidence relied on . . . falls well short of the 'compelling evidence'" recognized by *Oregon Insurance Guaranty Association*.). Here, the parties have not suggested that a relevant ruling in a separate judicial proceeding exists; therefore, I proceed to analyze whether the defendant insurers have a duty to defend looking only to the complaint and the insurance policy.

  A. The Complaint

  In most cases, the complaint arises in a formal lawsuit. However, Oregon's definition of "lawsuit" in this context also includes "administrative proceedings and actions taken under Oregon or federal law, including actions taken under administrative oversight of the Department of Environmental Quality ["DEQ"] or the United States Environmental Protection Agency pursuant to written voluntary agreements, consent decrees and consent orders." Or. Rev. Stat. § 465.480(1)(a). The statute further instructs that written action by the DEQ that "directs, requests or agrees that an insured take action with respect to contamination within the State of Oregon is equivalent to a suit or lawsuit as those terms are used in any general liability insurance policy." *Id.* § 465.480(2)(b); *see also Schnitzer Inv. Corp.*, 104 P.3d at 1169 (holding that DEQ letter notifying insured property was on contaminated sites listing and requesting investigation

and cleanup along with letter from insured to insurer detailing factual basis of DEQ's action was "the functional equivalent of a judicial complaint."); *GE Prop. & Cas. Ins. Co.*, 2005 WL 2044315, at *4 (holding that voluntary agreement between DEQ and insured detailing insured's specific obligations was "analogous to a complaint in court or charges in an administrative contested case proceeding.").

Applying these principles to this case, I have previously held that the letters from DEQ to Niemi concerning the sites at issue were equivalent to a complaint because they directed Niemi to take specific investigatory and remedial action. (6/8/05 Hr. Tr. at 63-64). Thus, the real issue here is whether the allegations made in these letters trigger the possibility of coverage under the defendant insurers' policy.

B. The Insurance Policy

The insurance policy aspect of the analysis presents some difficulty in this case because the policy at issue was lost due to the passage of time, and the parties have been unable to find or reconstruct it. The Oregon Environmental Cleanup Assistance Act ("OECAA") addresses lost policies in the context of environmental liability and establishes "minimum standards" for the parties to follow in "facilitating reconstruction of a lost policy and determining the terms of a lost policy." Or. Rev. Stat. § 465.479(3). Under these procedures, upon notice of a lost policy from the insured, the insurer must investigate whether a policy existed, and if it finds that a policy did exist, it must also investigate to discover the terms of the policy "relevant to any environmental claim." *Id.* § 465.479(3)(a). Where the specific policy or any part of it containing its terms cannot be found, the insurer must "provide copies of all insurance policy forms [it] issued . . . during the applicable policy period that are potentially applicable to the environmental

claim" and identify "which of the potentially applicable forms, if any, is most likely to have been issued." *Id.* § 465.479(3)(d).

The Act specifies that following these "minimum standards" does not create a presumption of coverage, or result in an "affirmation that if the policy was issued, it was necessarily in the form produced, unless so stated by the insurer." *Id.* § 465.479(4)-(5). The insured must still establish the existence of a policy by a preponderance of the evidence. *Id.* § 465.479(6). However, when the insured has done so, Oregon's legislative scheme allows the court to consider the form policy produced by the insurer in defining the terms of the parties' contract. *See id.* § 465.479(6)(a) (where insured proves by a preponderance of the evidence a policy existed and the insurer cannot prove the specific policy limits, "it shall be assumed that the minimum limits of coverage, including any exclusions to coverage, offered by the insurer during the period in question were purchased by the insurer"); *see also GE Prop. & Cas. Ins. Co.*, 2005 WL 2044315, at *3, 4-5 (citing the OECAA provision requiring insurers to produce form policies in absence of original policy terms and analyzing the form policy provision as if it were included in the parties' contract). Thus, in applying this statute, I must first determine whether there is a material dispute of fact concerning the existence of a policy, and second, if there is no material dispute that a policy existed, I must determine, if possible, what the relevant terms of the policy were.

   1.) Did a policy exist?

In support of its motion for partial summary judgment, Fireman's Fund produced varied evidence of the existence of an insurance policy between Oregon Auto/North Pacific and Niemi. First, there is a certificate of insurance from the defendant insurers showing that a policy for

Niemi numbered "CP 5215" existed from January 27, 1967 to January 27, 1970. Abbot Aff. in Supp. M. for Partial Summ. J. ("Abbot Aff."), Ex. A at 6. An Oregon Auto corporate representative stated this certification serves to "verify a policy exists." Def. Ex. 28 at 7. There are also insurance forms prepared by Niemi's insurance agent, Martin Knutsen & Son, Inc. ("Knutsen"), identifying North Pacific as Niemi's insurer from 1979-1980 and 1981-1982, with a policy number "CP 21919." Abbot Aff., Ex. A at 7-8, 10. Further, two Knutsen employees stated that Niemi was continuously insured by Oregon Auto/North Pacific until it switched to Fireman's Fund insurance in January 1982. *Id.* at 2; *id.*, Ex. B at 2.

In response, the defendant insurers have not produced any affirmative evidence indicating there was no policy; rather, they simply argue that the evidence produced is insufficient. This argument is unconvincing. By an Oregon Auto representative's own words, the certificate of insurance verifies the existence of a policy, and coupled with the other evidence indicating a policy existed at various points in time and the testimony of continuous coverage from Niemi's agent, I find that there is no material issue of disputed fact regarding the existence of a policy.

2.) What are the terms of the policy?

This second inquiry is not as easily resolved. As explained by an Oregon Auto/North Pacific employee, the companies' policies during the relevant time period typically included three types of documents: (1) declarations sheets identifying the parties to the policy, the subject of insurance, the premium, and the liability limitations; (2) the standard form terms; and (3) endorsements, which modify the standard form terms. Def. Ex. 132 at 3. Regarding the second category, Fireman's Fund has produced the defendant insurers' form policies, or parts of

them, from 1968, 1971, 1975, and 1978. *Id.*, Exs. D, E, & F. The defendant insurers have not presented any evidence that they either did not use a form contract with Niemi, or that they used a different form. Indeed, they produced these form policies as part of the "minimum standards" outlined in the OECAA. However, the defendant insurers have suggested that these forms do not accurately reflect the policy terms because they were altered through endorsements.

The endorsement issue is discussed in greater detail below, but for the purpose of deciding whether the form policies are useful generally, this argument fails. Even assuming the parties agreed to modify the form terms, the forms are relevant in determining those terms that were not modified. Thus, I conclude that under the OECAA, I can consider these forms as evidence of the policy terms. Or. Rev. Stat. § 465.479(3)(d) & (6); *GE Prop. & Cas. Ins. Co.*, 2005 WL 2044315, at *3, 4-5. There is a suggestion that each time the policy was renewed a new policy number was issued and, therefore, maybe a new form contract was issued as well. Def. Ex. 6 at 2. However, given that the terms relevant to the environmental claims remained materially the same throughout the years, this issue does not affect the outcome in this case.

As for the declarations sheets, there are two issues needing discussion. First, what were the liability limitations? And second, what was the subject of the insurance–that is, which of Niemi's properties were covered by Oregon Auto/North Pacific's policy at any given time? The certificate of insurance verifying coverage from 1967-1970 and the insurance forms prepared by Knutsen addressing coverage in 1979-1980 and 1981-1982, discussed above, state that the policy's liability limitation was $500,000. Based on this evidence, as well as Knutsen employee statements that it was Knutsen's business practice to recommend to customers that they not reduce their liability limitations so long as their business operations and liabilities remained

PAGE 8 - OPINION AND ORDER

essentially unchanged, Abbott Aff., Exs. A at 3, B at 2, Fireman's Fund argues that Niemi's liability limitation was $500,000 through the period of coverage. The defendant insurers have not produced any evidence suggesting there was a different liability limitation, but rather, simply argue that without the parties' specific policy, there is no way to know what the specific limitation was during throughout the term of coverage. However, uncontradicted evidence from various times throughout the period of coverage consistently showing $500,000 was the policy limit, coupled with testimony that it was business practice to keep the amount of liability coverage consistent, sufficiently proves that $500,000 was the liability limitation throughout the term of the policy. And by not identifying evidence to the contrary, the defendant insurers have failed to produce "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).

   The issue regarding which Niemi properties and entities were covered by the policy at which time is more complicated, but the resolution rests on essentially the same analysis. Fireman's Fund argues that Oregon Auto/North Pacific provided umbrella coverage for all of Niemi's properties and entities existing in 1967 based on the certificate of insurance, which defined the subject of insurance as "ALL OPERATIONS OF THE INSURED AS PROVIDED UNDER THIS POLICY." Abbot Aff., Ex. A at 6. Fireman's Fund further argues that as Niemi acquired new properties over the years, they were added to Niemi's existing policy once they came into existence. In support of this position, Fireman's Fund points to statements from Knutsen employees that their business practice, when dealing with family closely-held corporations like Niemi, was to recommend that the customer obtain one umbrella policy for all of its entities and owners, and that when the company acquires new entities, it should add them

to their existing policy. Hippensteel Aff. (2/2/05) at 2-3; Canessa Aff. (2/2/05) at 2-3. Additionally, the fact that Niemi bought umbrella coverage from Fireman's Fund[2] and Federated Mutual,[3] the other insurers involved in this case, supports an inference that Niemi acted similarly with regard to Oregon Auto/North Pacific.

On the other hand, the defendant insurers argue that even if Knutsen had the described business practice, the employees' statements are insufficient to prove that they followed it in this case. Specifically, they argue that the Knutsen employee statements should be given little, if any, weight because the employees also stated that Knutsen would only recommend that a customer include a newly acquired property in an existing policy if it was aware of the new property, and the employees could not recall whether Niemi told them about any new properties or whether they ever added any new properties to Niemi's policy. Def. Exs. 6, 9, 137, & 139.

Going back to the summary judgment analysis, the moving party has the initial burden to show there is no genuine issue of material fact. *MetroPCS, Inc. v. City and County of San Francisco*, 400 F.3d 715, 720 (9th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986)). This burden is met where the moving party demonstrates that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. The non-moving party must then come forth with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). Here, on the defendant insurers' motion for summary judgment it is clear they have not met their burden

---

[2]*See* Def. Exs. 5, 138; Abbot Aff., Ex. J.

[3]*See* Abbot Aff., Ex.G; Abbot Aff. (2/2/05), Ex.6.

PAGE 10 - OPINION AND ORDER

because, at a minimum, the evidence produced by Fireman's Fund creates a factual dispute.[4]

The harder question is whether Fireman's Fund is entitled to summary judgment on this issue. As before, Fireman's Fund has come forward with specific, albeit minimal, evidence supporting its argument that Niemi insured all its properties under one policy and added new properties when they were acquired. And in response, just as before, the defendant insurers have failed to refute Fireman's Fund's evidence with anything more than argument. Initially, the state of the record on this issue seems somewhat different than before because the defendant insurers point to specific statements from Knutsen employees to make their point. But, ultimately the bottom line is the same. Without any facts of their own, the defendant insurers are arguing that Fireman's Fund's evidence is too generic. I have previously rejected this argument, and I do so again here. I simply cannot conclude, based on this record, that there is a genuine issue of material fact to present to the factfinder. In the context of a lost policy where the parties are unable to locate any part of their contract or reconstruct its terms, the evidence is often necessarily "generic." Indeed, the Oregon statutory scheme anticipates this reality. *See* Or. Rev. Stat. § 465.479(3)(d). Thus, even though the evidence in this case is admittedly thin, without anything to the contrary, I conclude that it is sufficient to prove that Niemi purchased umbrella coverage from Oregon Auto/North Pacific in 1967 for all of its existing properties and then added new properties to the policy as they were acquired.

Finally, as indicated above, there is an issue regarding whether the parties' policy included endorsements modifying the form policy terms. The only evidence on this point is a

---

[4] This is true whether or not I follow the complaint-&-policy rule or consider the extrinsic evidence submitted by Fireman's Fund relating to the environmental conditions at the various sites.

PAGE 11 - OPINION AND ORDER

statement from an Oregon Auto employee that the company always included endorsements in its policies. Def. Ex. 132. Neither party has any specific evidence regarding whether endorsements were included in the policy at issue in this case, or, if endorsements were included, which form terms were modified. Consistent with my findings above, I accept this business practice evidence as sufficient to prove the parties' policy included endorsements. However, unlike before where the business practice related to a specific policy term, here, accepting the business practices does not provide any insight on the terms of the policy. Without some evidence that the endorsements modified the form terms addressing environmental liability or otherwise addressed coverage for environmental liability, there is no basis to conclude that any such endorsements are relevant to this case, and I must assume that the form policy provisions apply.

      3.) Comparison of the Complaint and the Policy

The final step in the analysis is to compare the factual allegations in the complaint with the policy terms to determine if there is "*any basis*" for coverage. *Ledford*, 877 P.2d at 83. To begin with, the form policy clearly includes a duty to defend provision stating that the insurance company has a "duty to defend any suit against the insured seeking damages on account of . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent." Abbot Aff., Ex. D at 2. The defendant insurers raise three specific issues concerning whether this duty was triggered by the DEQ's allegations: (1) whether the DEQ alleges an "occurrence" during the policy period; (2) whether the owned-property exclusion, excluding coverage for damage to the insured's own property, applies; and (3) whether the pollution exclusion, excluding coverage for property damage caused by a "discharge, dispersal, release or escape" of pollution, unless the "release or escape is sudden and accidental," applies. *Id.* at 6.

PAGE 12 - OPINION AND ORDER

The form policy provides that coverage only exists for property damage resulting from occurrences within the policy period. *Id.* at 2, 5. The defendant insurers argue that DEQ's allegations do not establish that the "occurrences" resulting in Niemi's environmental liability happened during the policy period. As this court recently stated, Oregon caselaw does not require specific allegations of timing. *GE Prop. & Cas. Ins. Co.*, 2005 WL 2044315, at *9 ("I [do not] see any indication in *Schnitzer* or in *Martin* [*v. State Farm Fire & Cas. Co.*, 932 P.2d 1207 (Or. Ct. App. 1997)] that a duty to defend is not triggered absent an allegation of exactly when the contamination occurred. . . ."). Rather, the key is whether, based on the allegations, the insured would be permitted to put on proof that there was an occurrence during the policy period. *Id.*

Here, DEQ does not clearly specify the timing of the various alleged releases; but, there is also nothing in the DEQ's allegations that would preclude Niemi from presenting evidence that the releases occurred during the policy period. The defendant insurers argue that the timing is specified as to the Warrenton site. There, Niemi discovered a release of contaminants in 1999 when it upgraded its underground fuel storage tanks. It reported the release to DEQ, and DEQ required it to investigate the resulting soil and groundwater contamination. In 2000, during this investigation, Niemi discovered another underground tank with a hole that was leaking. In its order requiring Niemi to remove the contaminated soil and continue investigating the site, DEQ referenced Niemi's 1999 permit to operate these containers as a basis for taking this action against Niemi. The defendant insurers argue that because DEQ did not specifically allege any "historic . . . leakage or contamination," 6/17/05 Baird Letter, at 2, that I must conclude for purposes of determining whether they have a duty to defend as to this site, that the "occurrences"

happened in 1999 and 2000, well after their policy period ended. This argument is in error. Whereas it is true DEQ did not specifically state when the releases occurred, there is nothing in the allegations that supports the view that the releases were contemporaneous with their discovery. Indeed, when DEQ ordered Niemi to continue its clean-up and investigative activities it knew that "the full nature, magnitude and extent of groundwater contamination had not been determined." Def. Ex. 114 at 2. Thus, I find that it is possible that Niemi could prove at some future time, based on the allegations made against it by DEQ, that the releases occurred during the defendant insurers policy period. *GE Prop. & Cas. Ins. Co.*, 2005 WL 2044315, at *9 ("The key here, as with all duty to defend cases, is that nothing in the Voluntary Agreement precluded proof that a release of contaminants within the policy period . . . contaminated the groundwater. Thus a duty to defend exists."). As such, this issue is resolved in favor of Fireman's Fund as to all the sites at issue.[5]

Second, the defendant insurers argue that DEQ's allegations fail to establish the possibility of coverage because they primarily identify damage to Niemi's property. Aside from alleging that damage crosses physical property boundaries, where there are allegations of possible damage to the groundwater or other publicly owned water sources, the owned-property exclusion does not apply. *Schnitzer Invest. Corp.*, 104 P.3d at 1169. And again, as this court recently held, a specific, affirmative allegation is not required to defeat this exclusion. *GE Prop. & Cas. Ins. Co.*, 2005 WL 2044315, at *8 ("[A] duty to defend can be triggered by an allegation of the threat or possibility of harm, rather than an allegation of actual harm."). Rather, coverage

---

[5]The Svenson, Cardlock/BulkPlant, Warrenton, and Midtown sites are the only ones still at issue in this case. Summary judgment was granted in the defendant insurers' favor as to the Landwehr and Long Beach sites. 6/8/05 Hr. Tr. at 90-91; 6/28/05 Hr. Tr. at 5.

exists for purposes of the duty to defend whenever the allegations "raise[] the *possibility* of groundwater contamination." *Id.* at *6 (emphasis added).

Here, possible impacts to publicly owned water sources were specifically identified in DEQ's letters addressing Niemi's Svenson and Bulk Plant/Cardlock properties. *See* Abbot Aff., Exs. M ("Diesel was observed from an area of line work and flowing into the parking lot . . . in Svenson, Oregon. Further investigation . . . has found fuel in the ground releasing and impacting the stream."), Ex. N ("The Niemi Oil Bulk Plant and the Niemi Oil Cardlock facility may have been significant contributors to a contaminant plume that extends to the [Columbia] river."). Similarly, the DEQ's Warrenton site letter referenced a "requested soil and groundwater investigation." *Id.*, Ex. L. Based on the holding in *GE Property & Casualty Insurance Company*, I also find that this is sufficient to trigger the possibility of coverage. 2005 WL 2044315, at *8 (citing *Schnitzer* as holding duty to defend triggered where no allegation of groundwater contamination but insured directed to investigate the "nature and extent of releases of hazardous substances on or from [its] property"). By requesting an investigation of the groundwater, DEQ has *raised the possibility* that it is contaminated. Finally, regarding Niemi's Midtown BP, DEQ simply stated that "a release was reported from an underground storage tank (UST) system at [Niemi's] facility . . . . As a responsible party for the facility, [Niemi is] required to clean up the release . . . ." Abbot Aff., Ex. K. This allegation is obviously the most tenuous in establishing a possibility of damage to third-party property; however, even so, it seems clear that evidence showing groundwater contamination or other damage to third-party property would not be precluded. Thus, this allegation is also sufficient to trigger a duty to defend.

Finally, the defendant insurers argue that none of DEQ's factual allegations establish that

the releases identified were "sudden and accidental," and therefore coverage is precluded under the pollution exclusion. The problem with the insurers' argument is that there is nothing in DEQ's allegations addressing whether the releases were accidental or not, and therefore, as before, there this nothing in the complaint preventing DEQ from holding Niemi liable for damages resulting from an accident. Had DEQ alleged that Niemi willfully released polluting materials the outcome would likely be different, but on this record, it seems that Oregon's fairly liberal construction of when a "possibility" of coverage exists has been satisfied. *Ledford*, 877 P.2d at 83 ("Even if the complaint alleges some conduct outside the coverage of the policy, the insurer may still have a duty to defend if certain allegations of the complaint, without amendment, could impose liability for conduct covered by the policy. Any ambiguity in the complaint with respect to whether the allegations could be covered is resolved in favor of the insured.") (citations omitted). As such, the defendant insurers' duty to defend Niemi has been triggered, and Fireman's Fund is entitled to partial summary judgment on this issue.

In conclusion, though I recognize the evidence in this case is thin, especially in regards to defining the terms of the insurance policy, under Oregon's statutory scheme and the applicable caselaw, I find that there is no material issue of fact regarding the defendant insurers' duty to defend Niemi in the pending environmental actions brought by DEQ, and as such, I GRANT Fireman's Fund's motion for partial summary judgment on this issue on all but the Warrenton site, and I DENY the defendant insurers' opposing motions. Regarding the Warrenton site, it must be remembered that I have previously denied summary judgment in favor of plaintiff on the issue of whether it was owned or operated by Niemi during the defendant insurers' policy periods. Thus, once that issue is resolved, if it is found that the property was controlled by

Niemi during the policy period then, in light of my ruling today, the defendant insurers have a duty to defend Niemi. However, if it is found that Niemi did not control the site during the policy period, then the defendant insurers do not have a duty to defend as to Warrenton.

IT IS SO ORDERED.

DATED this __9th__ day of November, 2005.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge