IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**FIREMAN'S FUND INSURANCE CO.**,

No. CV 03-0025-MO

Plaintiff,

AMENDED FINDINGS OF FACT AND
CONCLUSIONS OF LAW

v.

**OREGON AUTOMOBILE INSURANCE
CO.**, and **NORTH PACIFIC INSURANCE CO.**,

Defendants.

**MOSMAN, J.,**

## BACKGROUND

This case is a dispute between insurers about their respective duties to defend the

insureds, primarily former defendants Ed Niemi Oil Co., Inc. ("Niemi") and ETU, Inc. ("ETU"),

against any environmental actions brought against them by the Oregon Department of

Environmental Quality ("DEQ").  Under Oregon statute, a property owner facing environmental

liability can chose one insurer out of its group of potential insurers to assist in environmental

proceedings.  Or. Rev. Stat. § 465.480(3).  Then, it is the responsibility of the chosen insurer to

seek contribution from the others, if any. § 465.480(4).  Here, Niemi's potential insurers included

Fireman's Fund Insurance Company ("Fireman's Fund"), Oregon Auto Insurance Company and

North Pacific Insurance Company ("Oregon Auto/North Pacific" or collectively "defendant

insurers"), and Federated Mutual Insurance Company ("Federated Mutual").  Niemi chose

PAGE 1 - OPINION AND ORDER

Fireman's Fund to assist with the pending DEQ proceedings.  In this action, Fireman's Fund seeks

a declaratory judgment against the other insurers as to their respective obligations. The case has a

lengthy procedural history, and as a result of settlements, the only remaining parties are plaintiff

Fireman's Fund and defendant insurers Oregon Auto and North Pacific. I previously held that the

defendant insurers issued commercial package policies to Niemi for bodily injury and property

damage for the period from January 27, 1967 to January 27, 1982, with property damage liability

limits of $500,000 per occurrence. (*See* Op. & Order Nov. 9, 2005 (#251).) These parties

appeared before the Court in a four-day trial beginning February 4, 2010 to address any

remaining issues. Following the trial, both parties submitted proposed Findings of Fact and

Conclusions of Law. I now make my own Findings and Conclusions as described below, based

on my consideration of all the evidence and arguments at trial.

## FINDINGS OF FACT

I.    <u>Liability</u>

This litigation involves six gas station and petroleum sites: Midtown, Svenson,

Warrenton, Highway Services, Bulk Plant, and Cardlock.[1] The first of two primary issues

addressed at trial is liability—initially, I must decide when, if ever, each site or entity became

subject to defendant insurers' policies, and second, I must decide whether, when, and against

whom the DEQ issued suits sufficiently triggering a duty to defend. As described below, I find

that plaintiff proved by a preponderance of the evidence that each Niemi-related entity was added

---

[1] Midtown is located at 632 Marine Drive, Astoria, Oregon. Svenson is located on Route 6 in Svenson, Oregon. Warrenton is located at 238 S. Main Street, Warrenton, Oregon. Highway Services is located at 3108 Marine Drive, Astoria, Oregon. Bulk Plant is located at 490 Industry Street, Astoria, Oregon. Cardlock is located at 455 Industry Street, Astoria, Oregon.

as a named insured at the time of incorporation. The issue of DEQ suits involves mixed questions

of law and fact, so I address this issue in both sections.

      **A.**    ***Ed Niemi Oil Co., Inc.***

1.    On September 30, 1965, J. Ed Niemi incorporated his petroleum and heating oil

      distribution business as Ed Niemi Oil Co., Inc. ("Niemi"). (Pl.'s Ex. 1 at 22.)

2.    By January 27, 1967, the Niemi corporation held leases from Mobil Oil Co. ("Mobil") for

      the Midtown and Highway Services stations (Pl.'s Ex. 102-03) and a sublease from Mobil

      for the Bulk Plant storage/distribution facility (Pl.'s Ex. 7; *see also* Pl.'s Ex. 11). Also by

      January 27, 1967, Niemi operated the Svenson site, a Mobil service station, which was

      owned by the Niemi principals. (Pl.'s Ex. 34, 37, 36, 108-09, 111, 113.)

3.    By February 1, 1968, Niemi leased another Mobil service station at the Warrenton site.

      (Pl.'s Ex. 46.)

      **B.**    ***ETU, Inc.***

4.    On December 31, 1974, Alice Bechtolt Codd—who was Mr. Niemi's daughter and a

      shareholder in Niemi—and her then-husband Warren Bechtolt (now deceased) formed

      ETU in order to provide their children with an ownership interest in the Niemi business.

      (Pl.'s Ex. 248 Codd Dep. 102-03, April 19, 2004.)

      **C.**    ***Burns-Johanson***

5.    On October 7, 1975, the Bechtolts, through a company they formed called W.E.B. Oil

      Co., purchased a Shell bulk plant (the Cardlock site) from the Burns-Johanson company.

      (Pl.'s Ex. 31 at 168; Pl.'s Ex. 248 Codd Dep. 32-33, April 19, 2004.) Immediately

      following the purchase, W.E.B. Oil Co. took over the name Burns-Johanson and operated

the site as Burns-Johanson Oil Co. (Pl.'s Ex. 31 at 152, 164.)

**D.      *The Oregon Auto Policy***

6.      On February 13, 1967, the Knutsen Insurance Agency issued a certificate of insurance to

Mobil, showing that Oregon Auto issued insurance to Niemi to cover "all operations of

the insured as provided under this policy." (Pl.'s Ex. 118; Defs.' Ex. 501.) The policy,

CP5215, provided Niemi with bodily injury coverage up to $1 million and property

damage coverage up to $500,000 per occurrence. (*Id.*)

**E.      *Coverage Under the Oregon Auto Policy***

7.      Ms. Bechtolt Codd remembers this blanket policy as covering all Niemi companies as

they came into existence, and covering all sites. (Trial Tr. 73, 76-78 (Codd), Feb. 4,

2009.) Two Knutsen employees, Robert Canessa and Beverly Hippensteel, also testified

via deposition that Knutsen's usual business practice included recommending that

commercial accounts seek coverage under a single insurance policy for all related entities.

(Trial Tr. 65, 70 (Canessa), Feb. 4, 2009; Pl.'s Ex. 144 Hippensteel Aff. ¶ 3.) Donn

McVeigh, a live expert witness at trial, testified to the industry practice in the 1960s of

family-owned business obtaining coverage for all the related entities under one general

liability policy in order to avoid gaps in coverage or disputes between the related entities.

(Trial Tr. 105, 122-27 (McVeigh), Feb. 4, 2009.) I am persuaded by these witnesses, and I

find that plaintiff proved these practices by a preponderance of the evidence, and

defendants' evidence did not persuade me otherwise.

8.      Additionally, Mr. Canessa remembers preparing an application to Fireman's Fund in

October 1981 explaining the relationship of the various Niemi entities, which he believes

were all insureds under the Oregon Auto/North Pacific[2] liability policy. (Pl.'s Ex. 119, 248 Canessa Dep. 22-24, May 12, 2009.) When Niemi switched its coverage to Fireman's Fund on January 27, 1982, the time at which the parties can first identify a physical copy of a Niemi insurance policy, all Niemi-related entities were included in a single liability policy. (Pl.'s Ex. 128.)

9.      Plaintiffs also presented persuasive evidence that the Niemi entities, including Niemi, ETU, and Burns-Johanson Oil Co., shared responsibility and ownership of the sites at issue. For example, sometimes one Niemi entity would own or lease the property, while another Niemi entity owned the equipment, petroleum tanks, and/or inventory. (Pl.'s Ex. 1, 12-14, 18-19, 24-25, 28-30, 61-62, 248 Jensen Dep. 8-9, June 3, 2009.) This interrelated business model makes it more likely than not that the Niemi entities shared liability coverage.

10.     I find that ETU was added as a named insured at or around the time of incorporation, by January 1, 1975. I find that Burns-Johanson Oil Co. was added as a named insured at or around the time of incorporation, by October 7, 1975.

11.     In light of the above, I find that the commercial package policy at issue covered all liability of the named entities. As described at trial, the properties and operations of the insureds may have been relevant to calculate premiums (which were based on payroll and sales rates, updated each year through the audit process), but the coverage is provided to the named insureds. (Trial Tr. 112 (McVeigh), Feb. 4, 2009; Trial Tr. 282-83 (Canessa),

---

[2] During the time period at issue, Oregon Automobile Insurance Company became North Pacific Insurance Company to appeal to a broader customer base. For my purposes here, they are, together, the single entity that provided liability insurance to the Niemi entities.

Feb. 5, 2009; Pl.'s Ex. 248A Vavrek Dep.43:10-22, May 17, 2004.) Mr. McVeigh also

testified that exclusion of a specific location from the comprehensive general liability

policy is typically reflected in a policy exclusion, which was not found for the Niemi

entities' policies through defendant insurers or through plaintiff, nor adequately supported

by any other evidence. (*See* Trial Tr. 106-07, 135-36 (McVeigh), Feb. 4, 2009.)

  **F.**  ***Fireman's Fund Policy***

12. Niemi and the related entities changed insurers on January 27, 1982 when they obtained a

single comprehensive liability insurance policy from plaintiff. (Pl.'s Ex. 128.)

13. On March 29, 1986, the Niemi insureds amended the Fireman's Fund policy to include a

pollution exclusion.

  **G.**  ***DEQ Suits***

14. Defendant insurers acknowledged at trial that DEQ initiated suits with respect to all six

sites at issue in this litigation. (Trial Tr. 575, Feb. 10, 2009.) I further find the date of

those suits as follows:

  a.  Midtown—December 29, 1998 as to ETU; February 10, 1999 as to Niemi and

    ETU (Pl.'s Ex. 180; Defs.' Ex. 555)

  b.  Warrenton—February 14, 1999 as to both ETU and Niemi (Pl.'s Ex. 75)

  c.  Svenson—July 12, 2000 as to ETU; February 21, 2003 as to Niemi and ETU (Pl.'s

    Ex. 85; Defs.' Ex. 556)

  d.  Bulk Plant and Cardlock—August 21, 2001 as to Niemi (Pl.'s Ex. 151)

  e.  Highway Services—May 23, 2002 as to Niemi (Pl.'s Ex. 84)

Additionally, I find that plaintiff continues to defend Niemi regarding the Midtown and

Svenson sites, but defense regarding the other four sites concluded on August 1, 2009. (Trial Tr. 147-58 (Kane), Feb. 4, 2009.)

## II.    **Damages**

The second primary issue addressed at trial is damages. Plaintiff seeks recovery of defendant insurers' pro rata share of defense costs according to their time on the risk. (*See* Op. & Order Jan. 20, 2006 (#258) 5-6.) I initially find the total costs paid by plaintiff for each site, and make findings as to any excludable defense costs. The issue of damages is one that mixes law and fact, and I primarily address defendant insurers' challenges below in my conclusions of law.

### A.    ***Fireman's Fund's Paid Costs***

15.    Plaintiff presented evidence, as well as summaries, of bills it paid in connection with the six sites at issue through September 30, 2009. (Pl.'s Exs. 232-43.) While defendant insurers contest the categorization of certain bills paid, they concede that the costs as presented are at least reasonable. (Trial Tr. 229-30, Feb. 5, 2009.) I find the following breakdown by site:

a.    Midtown—total costs at Midtown are $269,310.12. (Pl.'s Ex. 235 at 12.) No cleanup or soil removal has taken place at Midtown, but plaintiff has paid for site investigation. (*See generally*, Pl.'s Ex. 248 Berggren Deps. Sept. 23, 2004, April 9, 2009; *see also* Trial Tr. 144-50, 255-56 (Kane), Feb. 4-5, 2009; Pl.'s Exs. 181, 183, 187, 190.)

b.    Warrenton—total costs at Warrenton are $767,303.50. (Pl.'s Ex. 237 at 13, less $7689.38 misallocated to the wrong site as acknowledged at trial.) Substantial activity has taken place at Warrenton, primarily related to site investigation. (*See*

PAGE 7 - OPINION AND ORDER

*generally*, Pl.'s Ex. 248 Berggren Deps. Sept. 23, 2004, April 9, 2009; *see also*

Pl.'s Exs. 21-11, 214, 218, 220, 223.) I find, as conceded by plaintiff, that some

remedial actions also took place at Warrenton. Plaintiff's environmental

consultant Gabriel Sabadell testified, and I find, that a November 2003 soil

removal resulted in $27,400 of removal costs and free product recovery resulted in

$64,000 of removal costs. (Trial Tr. 447 (Sabadell), Feb. 9, 2009.)

c.      Svenson—total costs at Svenson are $295,647.41. (Pl.'s Ex. 236 at 10.) No

cleanup or soil removal has taken place at Svenson, but plaintiff has paid for site

investigation. (*See generally*, Pl.'s Ex. 248 Berggren Deps. Sept. 23, 2004, April

9, 2009; *see also* Pl.'s Ex. 200.) Some tanks were removed in 2007 but plaintiff

did not fund the removal. (Trial Tr. 242 (Kane), Feb. 5, 2009.)

d.      Cardlock—total costs at Cardlock are $355,673.26. (Pl.'s Ex. 233 at 7.) No

cleanup or soil removal has taken place at the Cardlock site since plaintiff began

defending the Niemi entities. (Trial Tr. 443-44 (Sabadell), Feb. 9, 2009.)

e.      Bulk Plant—total costs at Bulk Plant are $1,127,344.61. (Pl.'s Ex. 232 at 16.)

Bulk Plant (as well as Cardlock) is one of five areas of concern within the Astoria

Area-Wide Site. (Trial Tr. 369 (Ehlebracht), Feb. 9, 2009; Pl.'s Ex. 167 Sections

5.2, 6.1, 6.4.) Substantial activity has taken place at Bulk Plant, including site

investigation and also some remedial action for which plaintiff paid a share of the

costs. Mr. Sabadell testified, and I find, that $103,700.00 of plaintiff's total Bulk

Plant costs actually went to removal or cleanup instead of investigation. (Trial Tr.

439-42 (Sabadell), Feb. 9, 2009.)

PAGE 8 - OPINION AND ORDER

f.      Highway Services—total costs at Highway Services are $242,035.05. (Pl.'s Ex.

234 at 9.) No cleanup or soil removal has taken place at Highway Services, but

plaintiff has paid for site investigation. (*See generally*, Pl.'s Ex. 248 Berggren

Deps. Sept. 23, 2004, April 9, 2009; *see also* Pl.'s Exs. 95, 171, 175, 178.)

16.     Plaintiff paid the following law firms and consultants as part of its defense of Niemi and

ETU: Rycewicz & Chenoweth (law firm), Marten Law Group (subsequent law firm),

EnviroLogic, Inc. (consultant for Astoria Area-Wide site), AMEC (Niemi's consultant for

Astoria Area-Wide site), GeoEngineers (consultant for gas stations other than Highway

Services), RSV Engineering (subsequent consultant for gas stations), and 3-Kings

(limited consultant). (*See* Trial Tr. 159, 166, 235-37, 426 (Kane), Feb. 4-5, 9, 2009.)

## CONCLUSIONS OF LAW

Plaintiff's burden of proof in this civil lawsuit is preponderance of the evidence, requiring

proof that defendant insurers have a duty to contribute to the defense and proof of the amount of

contribution necessary as damages. In addition to the findings above, I make the following

conclusions of law:

## III.    Duty to Defend and DEQ Suits

17.     I previously addressed the duty to defend in this case as follows: "[A] duty to defend

exists whenever the factual allegations in the complaint would permit the presentation of

evidence at trial of an activity covered by the policy." (Op. & Order Nov. 9, 2005 (#251)

3 (citing *Schnitzer Inv. Corp. v. Certain Underwriters at Lloyd's of London*, 104 P.3d

1162, 1169 (Or. Ct. App. 2005)).) The duty to defend is based on the possibility of

coverage, and the insurer is put on notice when "the complaint provides *any basis* for

which the insurer provides coverage" and may impose liability for conduct covered by the policy. *Ledford v. Gutoski*, 877 P.2d 80, 83 (Or. 1994) (citation omitted) (emphasis in original); *Ferguson v. Birmingham Fire Ins. Co.*, 460 P.2d 342, 347 (Or. 1969); *see also* Op. & Order Nov. 9, 2005 (#251) 2-5. Even if the allegations in the complaint are ambiguous, the duty to defend arises if the allegations may be reasonably interpreted to include coverage. *Paxton-Mitchell Cos. v. Royal Indem. Co.*, 569 P.2d 581, 584 (Or. 1977); *Nielson v. St. Paul Co.*, 583 P.2d 545, 548 (Or. 1978).

18.    In Oregon, any "owner or operator at or during the time of the acts or omissions that resulted in the release" is strictly liable for the costs to clean up or remove environmental contamination. ORS § 465.255(1)(a). An owner or operator is "any person who owned, leased, operated, controlled or exercised significant control over the operation of a facility." § 465.200(20). A facility includes a "site" or "structure," and any "equipment," "storage container, above ground tank, underground storage tank" on any site. § 465.200(13).

19.    The Oregon Environmental Cleanup Assistance Act ("ECAA") "instructs that written action by the DEQ that 'directs, requests or agrees that an insured take action with respect to contamination within the State of Oregon is equivalent to a suit or lawsuit as those terms are used in any general liability insurance policy.'" (Op. & Order Nov. 9, 2005 (#251) 4 (quoting ORS § 465.480(2)(b)).) I conclude that the statute does not limit a suit to the initial communication from the DEQ. Such a reading of the statute could result in a potentially responsible party's ("PRP's") insurer avoiding the duty to defend merely because that PRP was not the first-named PRP, which contravenes the purpose of the

PAGE 10 - OPINION AND ORDER

statute.

20.     In light of my findings in ¶ 14 and the ECCA standards described above, I conclude that

the duty to defend Niemi for the Midtown site arose as of February 10, 1999. The duty to

defend Niemi for the Warrenton site arose as of February 14, 1999. The duty to defend

Niemi for the Svenson site arose as of February 21, 2003. The duty to defend Niemi for

the Cardlock site arose as of August 21, 2001. The duty to defend Niemi for the Bulk

Plant site arose as of August 21, 2001. The duty to defend Niemi for the Highway

Services site arose as of May 23, 2002.

## IV.    **Challenged Costs**

Defendant insurers challenge a significant portion of the costs paid by plaintiff. These

challenges are discussed below.

### A.    *Remediation & Indemnity Costs*

21.     Defendant insurers challenge certain costs claimed by plaintiff as defense costs. The

ECCA, at ORS § 465.480(6)(a)-(b), describes the presumptions regarding defense and

indemnity costs under a liability policy as follows:

(a)     Defense Costs: "There is a rebuttable presumption that the costs of preliminary

assessments, remedial investigations, risk assessments or other necessary

investigation, . . . are defense costs payable by the insurer, subject to the

provisions of the applicable general liability insurance policy or policies."

(b)     Indemnity Costs: "There is a rebuttable presumption that payment of the costs of

removal actions or feasibility studies, . . . are indemnity costs and reduce the

insurer's applicable limit of liability on the insurer's indemnity obligations, subject

PAGE 11 - OPINION AND ORDER

to the provisions of the applicable general liability insurance policy or policies."

22. Plaintiff's expert witness offered his opinion as to costs associated with removal or cleanup—indemnity costs—after a review of all applicable invoices challenged by defendant insurers. Defendant insurers' expert offered an opinion about the nature of removal or cleanup work, but did not review the invoices in this case to determine whether specific invoices or activities should be categorized as removal or cleanup instead of defense. (Trial Tr. 384-88, 395, 409 (Ehlebracht), Feb. 9, 2009.)

23. Following from my findings in ¶ 15, I now conclude that $91,400 of plaintiff's costs for Warrenton went to removal or cleanup, leaving $675,905.50 in defenses costs. I conclude that $103,700.00 of plaintiff's costs for Bulk Plant went to removal or cleanup, leaving $1,023,644.61 in defense costs. I conclude that plaintiff did not pay for any removal or cleanup at Cardlock, Midtown, Svenson, or Highway Services. Accordingly, the defense costs for those sites are $355,673.26 (Cardlock), $269,310.12 (Midtown), $295,647.41 (Svenson), and $242,035.05 (Highway Services).

**B.    *Attorney Fees***

24. Defense costs under ECCA include both investigative expenses and attorney fees. *See St. Paul Fire & Marine Ins. Co. v. Crosetti Bros., Inc.*, 475 P.2d 69, 70, 72 (Or. 1970); *see also Gray Cary Ware & Freidenrich v. Vigilant Ins. Co.*, 114 Cal. App. 4th 1185, 1189 (2004) (duty to defend "includes providing competent counsel and paying all reasonable and necessary costs"). I conclude that the attorney fees incurred to defend Niemi, including fees for work related to development or evaluation of remedial action options, were defense costs, not damages or indemnity costs.

### C.    *DEQ Oversight Costs*

25.    Pursuant to the presumptions in the ECAA, I conclude that oversight or administrative

costs paid by plaintiff to DEQ for investigating and approving proposed courses of action

qualify as defense costs. These costs are similar to court costs incurred in defending

litigation. (*See* Trial Tr. 165, 233 (Kane), Feb. 4-5, 2009.)

### D.    *"No Further Action" Costs*

26.    I conclude that the costs incurred in seeking No Further Action letters for the Midtown

and Highway Services sites qualify as defense costs under the ECAA. These costs are

similar to seeking dismissal of a case, (*see* Trial Tr. 237 (Kane), Feb. 5, 2009), and the

work involved does not constitute a feasibility study under OAR 340-122-0085 or 340-

040-0040. Rather, the No Further Action letters here were sought pursuant to OAR 344-

122-0252. (*See* Pl.'s Ex. 190 at 34; *see also* Pl.'s Exs. 173, 178.)

### E.    *Pursuing Claims Against Other PRPs*

27.    I conclude that costs incurred by researching and pursuing possible contribution by other

PRPs, particularly regarding the Astoria Area-Wide claim to which Mobil became a PRP

contributor as a result of such efforts, qualify as defense costs. *See Sabre Farms, Inc. v.

H.C. Jordan*, 717 P.2d 156, 161-62 (Or. Ct. App. 1986) (corporation's defense of its

officers included payment to pursue contribution claims against third-parties).

### F.    *Insufficient Detail*

28.    Defendant insurers challenge a portion of plaintiff's costs as containing an insufficient

amount of detail, precluding defendant insurers from determining whether the costs are

investigative costs or removal/cleanup costs. Pursuant to my findings in ¶¶ 15, 23, only

two sites, Warrenton and Bulk Plant, had any removal or cleanup work done. For both of

those sites, consultants and attorneys kept relatively thorough notes showing the cost of

specific tasks. Mr. Sabadell, the environmental expert who reviewed the consultant bills,

had no trouble determining the costs and tasks when he conducted his review. As a result

of that review, some tasks *did* qualify as removal or cleanup and have been deducted

accordingly. I therefore conclude that the evidence of costs paid did provide sufficient

detail to distinguish investigative costs from removal costs.

### G.    *Civil Penalty Litigation (Warrenton)*

29.    Defendant insurers challenge plaintiff's costs to defend a DEQ penalty action related to

the Warrenton site. Plaintiff withdrew a $21,000 charge associated with that civil penalty

litigation and the costs sought do not include the charge. (Pl.'s Exs. 237 at 13, 243 at Tab

220.)

### H.    *Present Litigation Work*

30.    Defendant insurers challenge the costs associated with responding to discovery requests

and subpoenas in the present litigation. I conclude, however, that the work of the

underlying defense counsel and the consultants in reviewing documents for privilege and

advising on Niemi's responses qualifies as a defense cost on these facts. Here, counsel

and consultants were protecting Niemi's interests as they related to the underlying and

ongoing DEQ claims.

### I.    *Other Costs*

31.    I conclude that the remaining costs presented by plaintiff are appropriately documented

and qualify as defense costs. Defendant insurers object to the inclusion of costs incurred

PAGE 14 - OPINION AND ORDER

in an attempt to sell the Midtown site, but I find that the effort was primarily directed

toward obtaining a NFA letter. (Trial Tr. 148, 172-73 (Kane), Feb. 4, 2009.) Various

tasks requiring advice of counsel or consultants to which defendant insurers object were

primarily directed toward defending Niemi against the DEQ claims.

**V.    Allocation and Damages**

32.    I previously held that defendant insurers' share of any defense costs, by site, would be

determined pro rata by time on the risk during the years the insurance company parties to

this case provided liability insurance applicable to defense of the claims. (Op. & Order

Dec. 15, 2009 (#460) 2-4.)

   **A.    *Beginning Date for Allocation***

33.    The beginning date for Midtown, Warrenton, Cardlock, Bulk Plant, and Highway

Services depends on when defendant insurers began insuring Niemi and ETU, and the

date when Niemi or ETU obtained the sites at issue.

   a.    Midtown[3]—start date for allocation is January 27, 1967, the inception of the

      Oregon Auto policy. (*See* ¶¶ 2, 6.)

   b.    Warrenton—start date for allocation is February 1, 1968, the date when Niemi

      began leasing the site. (*See* ¶ 3.)

   c.    Cardlock—start date for allocation is October 7, 1975, the date when the

      Bechtolts purchased the site. (*See* ¶ 5.)

   d.    Bulk Plant—the start date for allocation is January 27, 1967, the inception of the

---

[3] Although ETU was the only named PRP for the Midtown site for the first several weeks
of the investigation, no costs were incurred before Niemi was named. (Pl.'s Ex. 235; *see also* ¶
14(a).)

PAGE 15 - OPINION AND ORDER

Oregon Auto policy. (*See* ¶¶ 2, 6.)

e.    Highway Services—the start date for allocation is January 27, 1967, the inception

of the Oregon Auto policy. (*See* ¶¶ 2, 6.)

f.    Svenson—the start date for Svenson's allocation is slightly more complicated:

i.    ETU was the only named PRP from July 12, 2000 to February 21, 2003,

when Niemi was added to the DEQ action. (*See* ¶ 14(c).)

ii.    For the defense costs related to Svenson that plaintiff incurred *before*

February 21, 2003, the start date for allocation is January 1, 1975, the date

immediately following ETU's incorporation, or the date when ETU

became a named insured under the Oregon Auto/North Pacific policy. (*See*

¶¶ 4, 7-11.)

iii.    For the defense costs related to Svenson that plaintiff incurred *after*

February 21, 2003, when Niemi was added as a PRP, the start date for

allocation is January 27, 1967, the inception of the Oregon Auto policy.

(*See* ¶¶ 2, 6.)

**B.    *End Date for Allocation***

34.    The end date for allocation is March 29, 1986, the expiration date of environmental

damage or pollution coverage on the Fireman's Fund policy, as a result of the pollution

exclusion. (*See* ¶ 13.)

**C.    *Allocation of Defense Costs***

35.    The allocation of defense costs to defendant insurers is determined by dividing (1) the

number of months from the allocation start date to January 27, 1982 by (2) the total

number of months from the allocation start date to March 29, 1986.

    a.      Midtown—defense costs of $269,310.12; defendant insurers are responsible for 78.26% (180 months ÷ 230 months), or $210,762.10.

    b.      Warrenton—defense costs of $675,903.50 ($767,303.50 less $91,400 in removal costs); defendant insurers are responsible for 77.06% (168 months ÷ 218 months), or $520,851.24.

    c.      Cardlock—defense costs of $355,673.26; defendant insurers are responsible for 60.32% (76 months ÷ 126 months), or $214,542.11.

    d.      Bulk Plant—defenses costs of $1,023,644.61 ($1,127,344.61 less $103,700 in removal costs); defendant insurers are responsible for 78.26% (180 months ÷ 230 months), or $801,104.27.

    e.      Highway Services—defense costs of $242,035.05; defendant insurers are responsible for 78.26% (180 months ÷ 230 months), or $189,416.63.

    f.      Svenson—

        i.      defense costs *before* 2/21/03 of $15,718.94; defendant insurers are responsible for 62.96% (85 months ÷ 135 months), or $9,896.64.

        ii.      defense costs *after* 2/21/03 of $279,928.47; defendant insurers are responsible for 78.26% (180 months ÷ 230 months), or $219,072.02.

36.    Total Defense Costs Owed—***$2,165,645.01***. This amount reflects costs through September 30, 2009.

37.    For Midtown and Svenson, defendant insurers owe 78.26% of defense costs beginning October 1, 2009 and continuing into the future.

PAGE 17 - OPINION AND ORDER

VI.  **Prejudgment Interest**

38.  Plaintiff is entitled to prejudgment interest of nine percent annum from the time any

payment was made. ORS § 82.010; *see also Klamath Pac. Corp. v. Reliance Ins. Co.*, 950

P.2d 909, 916-17 (Or. Ct. App. 1997); *Sch. Dist. No. 1, Multnomah County v. Mission

Ins. Co.*, 650 P.2d 929, 943 (Or. Ct. App. 1982).

VII.  **Defendant Insurers' Counterclaims**

39.  Defendant insurers seek a declaration that they have no obligation to defend the Niemi

entities and that plaintiff is not entitled to contribution. I previously held, and do so again

here, that defendant insurers have a duty to defend the named insureds under the

commercial package, comprehensive liability policy at issue here. (*See* Op. & Order Nov.

9, 2005 (#251).)

40.  Defendant insurers assert that they are not obligated to pay any amounts that plaintiff pays

or paid to indemnify the former Niemi defendants related to the Warrenton, Cardlock,

Bulk Plant, and Highway Services claims, due to plaintiff's settlement with those former

defendants. They cite *Carolina Casualty Insurance Co. v. Oregon Automobile Insurance

Co.*, 408 P.2d 198 (Or. 1965) for the proposition that "[c]ontribution is only appropriate

where an insurer resolves obligations of the insured to a third party, thus satisfying a

common obligation owed by all insurers." (Defs.' Trial Mem. (#473) 28.) On the issue of

contribution generally, *Carolina Casualty* simply confirms that "[a]n insurer's rights

against its co-insurer for contribution arises out of the equitable doctrine which holds that

one who pays money for the benefit of another is entitled to be reimburse[d]." 408 P.2d at

203 (citing several cases and a treatise in support). Otherwise, the case primarily analyzes

the types of evidence a court may consider when determining whether the paying insurer

can "prove the actionable facts upon which the original liability depends." *Id.* at 200.

41.   Defendant insurers also cite *Maine Bonding & Casualty Co. v. Centennial Insurance Co.*,

693 P.2d 1296 (Or. 1985) and *United States Fidelity & Guaranty Co. v. Bramwell*, 217 P.

332 (Or. 1923) to claim that "[t]he party seeking equitable contribution must discharge

the existing liability of the insured." (Defs.' Trial Mem. (#473) 28.) I assume defendant

insurers depend upon *Bramwell*'s language that "subrogation is only allowed where the

entire debt has been paid" but I find that *Bramwell* falls outside the situation at issue here.

*See Bramwell*, 217 P. at 338. *Bramwell* does not address the duties or liabilities of two

co-insurers, but rather discusses whether an insurance company that secured the state's

bank funds is "entitled to be subrogated to the right of the state to priority in payment

over the general creditors of the bank" when the bank becomes insolvent. *Id.* at 333. The

defendant in *Bramwell* was not a co-insurer but the state superintendent of banks who

maintained possession of the bank's assets. *Id. Maine Bonding* cites the same language

from *Bramwell* regarding discharge in its discussion of subrogation in the context of

primary and excess liability insurance policies. 693 P.2d at 1301. That case primarily

addresses the duty a primary insurer owes to the excess insurer to "exercise due care in its

handling of a claim." *Id.* at 1300. The court explains that subrogation extends that duty to

the excess insurer, who stands in the shoes of the insured, and holds that the "primary

insurer owes an excess insurer essentially the same duty of due diligence in claims

handling and settlement negotiating it owes to an insured." *Id.* at 1302. Again, this case

does not address similar facts, nor does it provide the legal support that defendant

insurers contend it does. Therefore, defendant insurers have not cited, nor have I found, any authority supporting their second counterclaim.

42.    Unlike defendant insurers' arguments above, general principles state that "[i]t is a prerequisite to a claim for contribution that the party seeking contribution . . . has discharged more than his or her fair share of the common liability or burden." 18 C.J.S. *Contribution* § 4 (2009). Additionally, the "equitable right to contribution and the obligation to contribute . . . arises when a party has paid the whole of the obligation *or more than his or her share of it*." 18 Am. Jur. 2d *Contribution* § 9 (2010) (emphasis added). No mention of full or complete discharge appears in the contribution sections of C.J.S. or Am. Jur.

43.    I conclude that the settlement with the former Niemi defendants does not preclude defendant insurers' contribution to indemnity amounts for cleanup or removal at the settled sites.

## CONCLUSION

For the reasons given above, I find in favor of plaintiff Fireman's Fund and I conclude that it proved its claims by a preponderance of the evidence presented at trial. Therefore, judgment shall be entered in favor of plaintiff.

IT IS SO ORDERED.

DATED this  14th  day of April, 2010.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge

PAGE 20 - OPINION AND ORDER